951 A.2d 857

Jason Allen BARBER, et al.

v.

CATHOLIC HEALTH INITIATIVES, INC., et al.

No. 2819 Sept.Term, 2004.

Court of Special Appeals of Maryland.

July 1, 2008.

410

Jeffrey S. Goldstein (Jonathan E. Goldberg, Bertram M. Goldstein, on the brief), Columbia, for Appellants.

Angus R. Everton of Hunt Valley and Thomas C. Marriner, Annapolis (John R. Penhallegon, Baltimore, Mary Alane Downs, Hunt Valley, James R. Chason, Towson), all on brief, for Appellees.

Panel: KRAUSER, C.J., HOLLANDER, J., and LAWRENCE F. RODOWSKY, J. (Retired, specially assigned).

HOLLANDER, Judge.

This medical malpractice appeal comes before us for the second time, on remand from the Court of Appeals. *See Barber v. Catholic Health Initiatives, Inc.*, 174 Md.App. 314, 921 A.2d 811 (*"Barber I"*), vacated, 400 Md. 396, 929 A.2d 155 (2007) (per curiam) (*"Barber II"*).[1] In its "Per Curiam Order" of July 30, 2007, the Court of Appeals did not reach the merits of our opinion in *Barber I*. Instead, it directed this Court to reconsider its decision in *Barber I* in light of the Court of Appeals's decision in *Carroll v. Konits*, 400 Md. 167, 929 A.2d 19 (2007), issued on July 27, 2007.[2]

---

1. The Court of Appeals granted *certiorari* in *Barber I* on July 30, 2007. *See Catholic Health Initiatives, Inc. v. Barber*, 400 Md. 646, 929 A.2d 889 (2007). On the same date, the Court issued *Barber II*.

2. The Court of Appeals issued its mandate in *Barber II* on August 29, 2007. This Court issued an Order on October 30, 2007, directing

The matter is rooted in a negligence action filed in the Circuit Court for Baltimore County, alleging survival and wrongful death claims arising from the death of Carolyn Barber, who underwent a repeat coronary bypass on November 24, 2000, and died on the same date. An autopsy revealed that Ms. Barber's pulmonary artery had been punctured.

On November 19, 2003, Jason Allen Barber, as Personal Representative of the Estate of Carolyn Barber, and Jason and Andrew Barber, as surviving sons of Ms. Barber, appellants, filed a Statement of Claim with the Health Claims Arbitration Office ("HCAO")[3] against six physicians and six entities, all appellees here. They are Catholic Health Initiatives, Inc.; St. Joseph Medical Center, Inc.; St. Joseph Medical Center Foundation, Inc.; Cardiac Surgery Associates, P.A.; Cardiac Anesthesia Associates, P.A.; Redmond C. Stewart Finney, Jr., M.D.; Lope T. Villa, Jr., M.D.; Lope T. Villa, Jr., M.D., P.A.; Garth Raymond McDonald, M.D.; Paul Gerard Burns, M.D.; David R. Larach, M.D.; and Ursula Adourian, M.D.

Pursuant to § 3–2A–06B of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code (2002 Repl. Vol.), appellants waived arbitration. On May 12, 2004, they filed suit against appellees in the Circuit Court for Baltimore County. That court dismissed the suit after finding defective the Certificate of Qualified Expert (the "Certificate") that was filed previously with the HCAO. That ruling was at issue in *Barber I*.

In *Barber I*, 174 Md.App. at 352, 921 A.2d 811, we ruled that, under the facts and circumstances of this case, the Certificate, which used the words "Health Care Providers" as a defined term, and which employed the legal shorthand of "et

counsel to submit memoranda addressing the import of *Carroll*. The memoranda were filed in December 2007 and January 2008.

**3.** As part of the Maryland Patients' Access to Quality Health Care Act of 2004, 2004 Sp. Sess., Chapter 5, Subtitle 3, the Health Claims Arbitration Office was renamed the Health Care Alternative Dispute Resolution Office, effective January 11, 2005.

al.," clearly referred to the defendants who were named in the suit, and thus satisfied the requirements of C.J. § 3–2A–04(b). Moreover, assuming that the Certificate was flawed, we saw "nothing in the statute that prohibited appellants from clarifying an alleged ambiguity of the nature at issue here by way of [two] affidavits from the attesting expert." *Id.* at 353, 921 A.2d 811. In addition, we concluded that the circuit court abused its discretion in failing to allow an extension of time for appellants to file a new Certificate, or in permitting appellants to make such a request to the Director of the HCAO. *Id.* at 359, 921 A.2d 811.

Claiming that *Carroll* does not conflict with our holdings in *Barber I,* appellants urge us not to disturb our original rulings. Conversely, appellees maintain that *Carroll,* and the principles underlying it, require us to affirm the circuit court. The task now before us is to determine whether *Carroll* requires us to reverse our decision in *Barber I.*

## FACTUAL AND PROCEDURAL BACKGROUND[4]

Appellants filed a "Claim Form" with the HCAO on November 19, 2003. *Barber,* 174 Md.App. at 316, 921 A.2d 811. Under the section entitled "HEALTH CARE PROVIDER(S)," and continuing on an addendum with another title of "Health Care Provider(s)," appellants specifically identified each of the appellees—six physicians and six entities—by full name and address. *Id.* at 318, 921 A.2d 811. On the same date, appellants filed a "Statement of Claim" with the HCAO, pursuant to the Health Care Malpractice Claims statute (the "Act"), C.J. §§ 3–2A–01 to 3–2A–09, in which they again specifically named all twelve appellees in the caption. *Id.* At the end of the caption, all twelve were identified collectively as "Health Care Providers." *Id.* In addition, all twelve were again specifically mentioned in the text of the Statement of

---

4. In the interest of expediency, we shall restate many of the facts as they were presented in *Barber I.* We also incorporate by reference from *Barber I* any facts that we have omitted.

Claim, and were referred to collectively as "Health Care Providers." *Id.*

Appellants timely filed their "Claimants' Certificate Of A Qualified Expert," along with a medical report signed by Kenneth M. LeDez, M.B., Chg., FRC, on February 17, 2004. *Id.* at 319, 921 A.2d 811. The Certificate's caption listed appellants as "Claimants." In regard to the opposing parties, it stated: "CATHOLIC HEALTH INITIATIVES, INC., a/k/a CATHOLIC HEALTH INITIATIVES, et al." The words "Health Care Providers" appear underneath the name of that entity. *Id.*[5]

The text of the Certificate provided, in part:

I HEREBY CERTIFY that I have reviewed the medical records and/or other documentation pertaining to the history, conditions, injuries, and death of Carolyn Barber, as such relate to the incidents involved herein.

I HEREBY CERTIFY that *there were departures from and/or violations of the standards of medical care rendered to Carolyn Barber by the Health Care Providers.* Such departures and/or violations were the direct and proximate cause of injury to Carolyn Barber, and were a substantial factor in causing her death.

*Id* at 319–20, 921 A.2d 811 (emphasis added by *Barber I*). The accompanying certificate of service listed the names of all twelve appellees. *Id.* at 320, 921 A.2d 811.

Dr. LeDez's medical report of February 16, 2004, is also relevant. It provided, in part:

I have reviewed the medical records and other pertinent materials regarding Carolyn Barber. I have concluded that *the care rendered by the Health Care Providers* fell below and deviated from the accepted medical standards for health care providers of similar training and experience. *Furthermore, it is my opinion that such Health Care Providers' actions or omissions did proximately cause injury to Caro-*

---

5. The appearance of the Caption of the Certificate is reproduced in *Barber I* at 174 Md.App. at 319, 921 A.2d 811.

*lyn Barber,* and was a substantial factor in causing her death.

*Id.* (Emphasis added by *Barber I.*)

As noted, appellants filed suit in the circuit court on May 12, 2004. Shortly thereafter, on July 15, 2004, this Court issued its decision in the case of *D'Angelo v. St. Agnes Healthcare, Inc.,* 157 Md.App. 631, 853 A.2d 813, *cert. denied,* 384 Md. 158, 862 A.2d 993 (2004). The filing of *D'Angelo* prompted appellees to move to dismiss the suit filed in this case. They argued that the Certificate did not comply with the requirements of C.J. § 3–2A–04, because appellants failed to name each defendant, either in the caption or in the text. *Id.* at 321, 921 A.2d 811. In their response, appellants maintained, *inter alia,* that the Certificate complied with the statute, because each defendant was fully identified on the Claim Form and on the Statement of Claim filed with the HCAO, and were collectively identified as "Health Care Providers," a reference to a discrete group of persons and entities. *Id.* at 321, 921 A.2d 811. Nevertheless, they submitted an affidavit from Dr. LeDez, dated November 23, 2004, and a Supplemental Affidavit on January 25, 2005, clarifying that, by using the term "Health Care Providers" in the Certificate, he was referring to all of the defendants (appellees) identified previously in the Statement of Claim. *Id.*

Following a hearing held on January 31, 2005, the circuit court granted the motions to dismiss, in an Order of February 2, 2005. *Id.* at 323, 328, 921 A.2d 811. On February 11, 2005, appellants filed a "Motion for Reconsideration, or in the Alternative, Motion for Leave to file Supplemental Certificate of Qualified Expert, Nunc Pro Tunc." *Id.* at 329, 921 A.2d 811. The circuit court denied that motion on March 15, 2005. *Id.* The first appeal followed.

In *Barber I,* we reversed and remanded. As noted, we concluded that the court erred in dismissing the case on the ground that the Certificate did not re-name all twelve appellees, because they were referred to collectively as "Health Care Providers," a defined term that clearly referred to the

discrete group of persons and entities previously identified in earlier HCAO submissions. *Id.* at 350–51, 921 A.2d 811. In addition, we considered it salient that, after naming Catholic Health Initiatives in the caption of the Certificate, appellants used the common legal abbreviation of "et al.," which we regarded as a clear reference to all of the defendants identified in the prior HCAO submissions. *Id.* at 351–52, 921 A.2d 811. We also relied on C.J. § 3–2A–02(d), which provides that, unless otherwise indicated, "the Maryland Rules *shall* apply to all practice and procedure issues arising under this subtitle." (Emphasis added.) *Barber I,* 174 Md.App. at 352, 921 A.2d 811. In turn, Md. Rule 1–301(a) governs the "form of court papers" and provides: "An original pleading shall contain the names and addresses . . . of all parties to the *action. . . . In other pleadings and papers, it is sufficient to state the name of the first party on each side with an appropriate indication of other parties.*" (Emphasis added.)

As indicated, even if the Certificate was flawed, we reasoned that Dr. LeDez's two affidavits clarified that, by his use of the term "Health Care Providers" in the Certificate, he was referring to all of the defendants named in the Statement of Claim. *Id.* at 353, 921 A.2d 811. Upon our review of the statutory scheme, we saw "nothing in the statute that prohibited appellants from clarifying an alleged ambiguity of the nature at issue here by way of affidavits from the attesting expert." *Id.* at 331, 921 A.2d 811. We also distinguished *D'Angelo* and a second case, *Walzer v. Osborne,* 395 Md. 563, 911 A.2d 427 (2006). *Id.* at 351, 921 A.2d 811.

In the alternative, we held that the court should have permitted the filing of a revised Certificate, explaining, *id.* at 359, 921 A.2d 811:

> On the facts of this case, in which appellants timely filed a Certificate whose alleged flaws came to light on the basis of an appellate opinion filed months later, and where a dismissal without prejudice was the same as a dismissal with prejudice because limitations had expired, we believe the court should have vacated the judgment and permitted

appellants to seek a good cause extension, either from the court itself or the Director.[6]

## DISCUSSION

## I.

Before reviewing the contentions in the parties' memoranda, we pause to review *Carroll*, which led the Court of Appeals to vacate *Barber I* and remand to us for reconsideration.

Dr. Efem E. Imoke performed a unilateral mastectomy on Mary Carroll on September 19, 2001. *Carroll*, 400 Md. at 172, 929 A.2d 19. To facilitate the administration of chemotherapy, Dr. Imoke left a catheter inside Carroll's chest, which was supposed to be removed within two months after completion of chemotherapy. *Id.* at 172–73, 929 A.2d 19. Dr. Imoke, however, did not schedule an appointment to remove the catheter. *Id.* at 173, 929 A.2d 19. Instead, he relied on Dr. Phillip H. Konits, Carroll's oncologist, to notify him when Carroll's chemotherapy was completed. *Id.* Carroll completed chemotherapy on April 11, 2002, but the catheter was not removed until March 25, 2003. *Id.*

On March 25, 2005, Carroll filed a complaint with the Health Care Alternative Dispute Resolution Office (the "HCADRO").[7] *Id.* She alleged "that Drs. Konits and Imoke were negligent in failing to communicate the need to have the catheter removed in a timely manner." *Id.* Further, she alleged that the prolonged presence of the catheter caused pain, suffering, and various medical problems. *Id.* Just over four months later, on August 4, 2005, Carroll filed a letter signed by Dr. Wanda J. Simmons–Clemmons, which purported to be a Certificate. *Id.* After reciting Carroll's medical treatments, Dr. Simmons–Clemmons wrote, *id.* at 173–74, 929 A.2d 19:

---

6. We expressly adopt and incorporate here the legal reasoning that is more fully articulated in *Barber I*.

7. This office was previously known as the Health Claims Arbitration Office. *See* C.J. § 3–2A–03.

"In my professional opinion, there was no clear communication to the patient that indicated she should seek medical attention in the removal of the catheter from her chest after chemotherapy was completed. If this was done, it was not documented. Secondly, there was mention made of an approximate time chemo should be completed by Dr. Konits in his consult dated January 31, 2002. The note was signed off by Dr. Ohio; however, there was mention of completion of chemo in multiple subsequent office visits. Also, the patient was to follow-up with Dr. Imoke in September 2002. Again, no mention was made that the patient should call sooner if and when chemo ended. Neither was the patient recalled for her September 2002 follow-up. If this was done I do not have a copy of the documentation of it. Thirdly, it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for too long[,] i.e. A DVT and chronic venous stasis of the right arm with chronic lymphedema."

On October 3, 2005, Drs. Konits and Imoke moved to dismiss the claim with the HCADRO, arguing that Dr. Simmons–Clemmons's documentation was deficient under the requirements set forth in C.J. § 3–2A–04(b). *Id.* at 174–75, 929 A.2d 19. They argued that Carroll failed to file a Certificate and that "she merely tendered an informal, unsworn letter." *Id.* at 175, 929 A.2d 19.

The Director granted Carroll's request for an additional 60 days to correct the deficiencies in her submission. *Id.* On October 28, 2005, in an attempt to rectify the defects in the original certificate, Carroll submitted an amended document. *Id.* The certificate again included a summary of Carroll's medical visits and treatments, largely the same as the language quoted *supra*, with the exception that Dr. Simmons–Clemmons altered the text from "it does appear that Mrs. Mary Carroll suffered complications arising from having a catheter in place for too long" to "having a catheter in place for longer than what is standard treatment[.]" *Id.* Additionally, a new paragraph was added to the second letter, which stated: "It is my professional opinion that Mrs. Carroll sus-

tained injury secondary to below standard of care received in regards to removal of the Hickman catheter after chemotherapy. Please be advised that I do not devote more than 20 percent of my annual time to activities that directly involve personal injury claims." *Id.*

Dr. Konits renewed his motion to dismiss on December 2, 2005, claiming that the updated certificate still failed to meet the specific requirements of § 3–2A–04(b). *Id.* On or about the same date, Carroll waived arbitration and the matter was transferred to the Circuit Court for Baltimore City. *Id.* Dr. Konits moved to dismiss on December 30, 2005, asserting the same grounds, i.e., "that the certificate and report[8] did not comply with the relevant provisions of the statute." *Id.* at 176, 929 A.2d 19. The circuit court dismissed the case against Dr. Konits on March 22, 2006. *Id.*

The Court of Appeals affirmed. After setting forth the history of the "Health Care Malpractice Claims Statute" and the statutory background of C.J. § 3–2A–04(b), the Court concluded that, according to "the plain language" of C.J. § 3–2A–04(b), a Certificate "must contain the qualified expert's affirmation as to two separate conditions-(1) that the defendant-physician departed from the standards of care, and (2) that such a departure was the proximate cause of plaintiff's alleged injury." *Id.* at 194, 929 A.2d 19. In the Court's view, Dr. Simmons–Clemmons's "purported replacement Certificate" did not satisfy the second requirement, but "arguably" may have satisfied the first condition under § 3–2A–04(b). *Id.*

The Court noted, *id.* at 194–95, 929 A.2d 19:

As to the second and unsatisfied requirement, Dr. Simmons–Clemmons stated that:

"It is my professional opinion that Mrs. Carroll suffered injury secondary to below standard of care received in

---

8. C.J. § 3–2A–04 requires a claimant to file a certificate "with a report of the attesting expert attached." The *Carroll* Court and the parties sometimes interchangeably use the terms "certificate" and "certificate and report." When we refer to the "Certificate" we shall also refer to its attached report, unless otherwise indicated.

regards to removal of the Hickman catheter after chemotherapy."

We assume that when Dr. Simmons–Clemmons stated that Carroll's *injury* was "secondary to below standard of care[,]" that she meant the *treatment* given to Carroll fell below the standard of care. Notwithstanding this assumption, Dr. Simmons–Clemmons failed to state, with clarity, that the treatment Carroll received or failed to receive, fell below the standard of care *and was the proximate cause of her injuries.* In fact, at no point, did she state that the alleged departure from the standard of care was the proximate cause of Carroll's injuries.[]

Of import here, the Court expressly agreed with Drs. Konits and Imoke, who "interpret the language of § 3–2A–04(b) as requiring that the Certificate identify the specific individual or individuals who breached the standard of care." *Id.* at 195–96, 929 A.2d 19. According to Drs. Konits and Imoke, "the purported Certificate is incomplete because it fails to identify specifically the licensed professionals against whom Dr. Simmons–Clemmons's claims applied," *id.*, and the Court said: "Again, we agree." *Id.* at 196, 929 A.2d 19

The Court reasoned, *id.* at 196, 929 A.2d 19:

Maryland law requires that the Certificate mention explicitly the name of the licensed professional who allegedly breached the standard of care. *See Witte [v. Azarian,],* 369 Md. [518, 521, 801 A.2d 160 (2002)], 801 A.2d at 162 (explaining that "unless . . . the claimant files with the [Health Care Alternative Dispute Resolution Office] a certificate of a qualified expert attesting that *the defendant's* conduct constituted a departure from the standard of care and that the departure was the proximate cause of the alleged injury, the claim must be dismissed . . .") (emphasis added); *McCready [Memorial Hospital v. Hauser,* 330 Md. 497, 500, 624 A.2d 1249 (1993)], 624 A.2d at 1251 (articulating that "the plaintiff must file a Certificate of Qualified Expert (expert's certificate) attesting to a *defendant's* departure from the relevant standards of care which proximately caused the plaintiff's

injury") (emphasis added); *Watts v. King,* 143 Md.App. 293, 306, 794 A.2d 723, 731 (2002) (stating that claimants are "required to file a certificate of a qualified expert *attesting that the licensed professional* against whom the claim was filed breached the standard of care.") (emphasis added); *D'Angelo,* 157 Md.App. at 646, 853 A.2d at 822 (concluding that the expert's certificate must include the name of the licensed professional against whom the claims were brought because, without that information, "the certificate requirement would amount to a useless formality that would in no way help weed out non[-]meritorious claims."). *We believe that this requirement is consistent with the General Assembly's intent to avoid non-meritorious claims. Moreover, it is reasonable because the Certificate would be rendered useless without an identification of the allegedly negligent parties. When a Certificate does not identify, with some specificity, the person whose actions should be evaluated, it would be impossible for the opposing party, the HCADRO, and the courts to evaluate whether a physician, or a particular physician out of several, breached the standard of care.* (Emphasis added.)

The Court noted that the certificate in issue included the names of five physicians, only two of whom were named as defendants. In addition to Dr. Imoke and Dr. Konits, it also mentioned a Dr. Ohio, an unnamed cardiologist, and an unnamed primary care physician. *Id.* at 197, 929 A.2d 19. Moreover, the Court observed that Dr. Simmons-Clemmons "stated very generally that 'there was no clear communication to the patient....'" *Id.* In the Court's view, she "failed to state with sufficient specificity which physician or physicians breached the standard of care and which physician or physicians were allegedly responsible for Carroll's injuries. Equally egregious, however, is that the Certificates failed to state what the standard of care was or *how* Dr. Imoke or Dr. Konits departed from it." *Id.*

The Court explained, *id.* at 198, 929 A.2d 19:

A general assertion, such as the one made by Dr. Simmons–Clemmons, that there was "no clear communication to

the patient" by unspecified doctors regarding the timing of the removal of the catheter is deficient in two respects. Dr. Simmons–Clemmons did not explain in the Certificate the requisite standard of care owed to Carroll. Simmons–Clemmons also failed to state which doctor, or doctors, owed Carroll a specific duty under that standard. Without such statements by Dr. Simmons–Clemmons, *the deficiencies in both the first and second Certificate go well beyond the issue of identity and proximate cause. The Certificates are wholly lacking in any assertion that either defendant departed from an applicable standard of care. They do not even come close to complying with the statutory requirement.*

We therefore conclude that the alleged Certificate was also deficient in this respect and that the Circuit Court was correct in dismissing the case on the grounds that Carroll failed to file a proper Certificate. This conclusion is in accordance with this Court's interpretation of the application of the statutory requirements for the filing of medical malpractice claims. (Emphasis added.)

The Court concluded, *id.* at 201, 929 A.2d 19:

For the foregoing reasons, we hold that a Certificate is a condition precedent and at a minimum, must identify with specificity, the defendant(s) (licensed professional(s)) against whom the claims are brought, include a statement that the named defendant(s) breached the applicable standard of care, and that such a departure from the standard of care was the proximate cause of the plaintiff's injuries. In the case *sub judice,* the [C]ertificate was incomplete because it failed to specifically identify the licensed professionals who allegedly breached the standard of care and failed to state that the alleged departure from the standard of care, by whichever doctor, or doctors, the expert failed to identify, was the proximate cause of Carroll's injuries. Therefore, because the Certificate is a condition precedent, the Circuit Court for Baltimore City correctly granted the appellees' motion to dismiss the case and, accordingly, we affirm the judgment of the Circuit Court for Baltimore City.

Several other points are noteworthy. The Court observed that, under C.J. § 3–2A–02(d), the Maryland Rules "control the practice and procedure arising from the Health–Malpractice Claims Subtitle." *Id.* at 183 n. 13, 929 A.2d 19. In turn, Md. Rule 1–204(a) provides:

"When these rules or an order of court require or allow an act to be done at or within a specified time, the court, on motion of any party and for cause shown, may (1) shorten the period remaining, (2) extend the period *if the motion is filed before the expiration of the period originally prescribed or extended by a previous order,* or (3) on motion filed after the expiration of the specified time period, permit the act to be done *if* the failure to act was the result *of excusable neglect....*" (Emphasis added.)

Notably, relying on *Navarro–Monzo v. Washington Adventist Hosp.,* 380 Md. 195, 200–04, 844 A.2d 406 (2004), the Court expressly rejected Dr. Konits's argument "that no extension could be granted for good cause because Carroll did not request the good cause extension within the 180–day period." *Id.* at 184, 929 A.2d 19. In light of the Court's resolution o f the case, it declined to resolve Dr. Konits's claim that "the Director lacked good cause to grant Carroll's extension." *Id.* Nevertheless, citing *McCready Memorial Hospital v. Hauser,* 330 Md. 497, 509, 624 A.2d 1249 (1993), the Court characterized good cause extensions as " 'malleable,' " noting that they provide "room for the Director's discretion." *Id.* at 185, 929 A.2d 19. Significantly, the Court observed: "In accordance with the statutory language and consistent with our prior case law, we believe that the General Assembly made it clear that the good cause extensions are discretionary and without time limitations, so long as the Claimant demonstrates good cause." *Id.*

## II.

The parties vigorously disagree about the effect of *Carroll* on the case *sub judice.* Appellants contend, *inter alia,* that they satisfied the statutory requirements by fully listing each

defendant on the Claim Form and on the Statement of Claim submitted to the HCAO, and then defining them collectively by the term "Health Care Providers." In addition, they argue that the use of "et al." after the lead name in the Certificate, along with the use of the defined term of "Health Care Providers," clearly referred to the defendants identified previously in HCAO submissions. Thus, they insist that appellees were fully aware of the identities of the particular health care providers who allegedly deviated from the standard of care and proximately caused injury to the decedent.

Appellants assert:

> Here, the Defendants/Health Care Providers ... were individually listed on the Claim Form under the heading of Health Care Providers, individually listed in the caption of the Statement of Claim and identified as "Health Care Providers," and individually listed in the certificate of Service attached to the Certificate of Qualified Expert and Report. Under these circumstances, referring to them in the Certificate of Qualified Expert collectively as Health Care Providers is mentioning them explicitly and/or identifying them with specificity. There can be no question as to who were the "Health Care Providers" mentioned in the Certificate and Report. It would be ridiculous to argue otherwise.

Further, pointing to the use of "et al.", coupled with Md. Rule 1–301, appellants contend:

> [T]here can be no confusion about who is being referenced when the term "Defendants" or "Health Care Providers" is utilized. In pleadings and papers filed after the original pleading (such as the Statement of Claim), it is sufficient to state the name of the first party on each side with an appropriate indication of other parties. Here, the caption of the Certificate of Qualified Expert identified the Health Care Providers as "Catholic Health Initiatives, Inc., a/k/a Catholic Health Initiatives, *et al.*" (emphasis supplied).

They add: "If the Court of Appeals intended to hold that the Health Care Providers' actual names must be included in the Certificate, it would have stated that. It did not."

In addition, appellants rely on the two affidavits filed by their expert. They contend that any ambiguity was cured by those affidavits. They assert: "To the extent that there was any confusion, Dr. LeDez's two Affidavits make clear that by "Health Care Providers" he meant *all* of those licensed professionals listed in the Claim Form and Statement of Claim."

Appellants concede that *Carroll* requires a certificate to "state that the named Health Care Providers breached the standard of care and that the departure from the standard of care proximately caused injury." But, they maintain that their Certificate met this standard by stating that "there were departures from and/or violations of the standard of care rendered to Carolyn Barber by the Health Care Providers. Such departures and/or violations were the direct and proximate cause of injury to Carolyn Barber, and were a substantial factor in causing her death."

Further, appellants insist that *Carroll* "does not disturb" our holding in *Barber I* that the circuit court "has the authority to grant an extension of time" to file a revised Certificate under C.J. § 3–2A–04(b)(5) and 3–2A–05(j). They observe that C.J. § 3–2A–04(b)(5) is silent as to the circuit court's authority to issue an extension of time and, "[a]s such, the Circuit Court had the authority and ability to grant an extension of time[.]"

Appellants note that the circuit court dismissed this case pursuant to C.J. § 3–2A–04(b)(1), which does not reserve power in the circuit court to dismiss a claim. They suggest that, "if the Circuit Court has the authority to dismiss the case without such authority being specifically vested in it by the statute," it should "likewise have the authority to grant an extension of time for good cause shown." Moreover, appellants insist that they showed good cause and were entitled to an extension of time to file another Certificate.

According to appellants, "The factual and legal scenarios of *Carroll* and the instant case are easily distinguishable," and "[t]hese distinctions are significant." Appellants assert: "The Court of Appeals did not hold that a Certificate must contain the proper name of the Health Care Providers in order to survive statutory scrutiny." They argue: "What *Carroll* stands for is that the licensed professionals as to whom the Certificate (and Report) applies must be mentioned explicitly and/or identified with specificity in such a way so that the opposing party(ies), the HCADRO and the court know to whom it refers. None of these requirements dictate that proper names be included in the Certificate." Because the Statute is in derogation of the common law, appellants maintain that it should be strictly construed.

Appellees inject a new issue in this appeal: they now challenge the adequacy of the contents of the Certificate. Appellees acknowledge that in the briefs they submitted in connection with *Barber I*, they never discussed or challenged the adequacy of the content of the Certificate. But, claiming that this "is an integral part of the reasoning" in *Carroll* and *Walzer*, they maintain that they may raise a challenge to the "adequacy" of the Certificate "at any time," because the filing of a proper certificate is a condition precedent to the filing of a medical malpractice action.

Characterizing *Carroll* as "the culmination of a series of opinions ... interpreting the statutory requirement of a Certificate of Merit as a condition precedent" to the institution of medical malpractice action, appellees argue:

> [T]he certificate of merit is more than a mere formality, and actually requires a health care malpractice claimant to obtain an expert's opinion certifying that there have been departures from accepted standards of care and that those departures were the proximate cause of compensable injury to the claimant, and moreover, requiring the claimant to disclose, *at the stage of certification, and as to each defendant,* the specific *contentions* as to the liability of the individual defendants sued and the damages claimed against them. It is in this latter respect that the Certificate ...

was fatally defective, and the defects in the Certificate were not cured[.]

According to appellees, the Certificate and the Affidavits "do not identify the standards of care violated" by the defendants, or specify how the actions of the appellees proximately caused injury to the decedent. They argue:

The key point inherent [in *Carroll*] is that a proper certificate of merit and report is more than merely a rote declaration that some or all of the defendant health care providers deviated, in some unexplained way, from accepted standards of care, and that some such deviation or deviations were the cause of undescribed harm to the plaintiff. . . . Furthermore, it is particularly noteworthy that the health care providers in this case are all members of separate and distinct specialties: Dr. Larach and Dr. Adourian, are anesthesiologists. Dr. Lope T. Villa, Jr. is a thoracic surgeon. Dr. Finney, Dr. McDonald and Dr. Burns were or are cardiac surgeons. St. Joseph's Medical Center, of course, is a hospital, and Catholic Health Initiatives is a holding company.

Moreover, appellees maintain that the Certificate (and Report) "are *less specific* about the identity of the offending health care providers and how they deviated from accepted standards of care" than were the documents at issue in *Carroll.* Noting that Dr. LeDez practices in Newfoundland, Canada, appellees argue: "It is not by any means obvious that Dr. LeDez is familiar with accepted standards of care in a community such as Towson, Maryland[.]" Further, they posit:

At least in the case of the expert's reports in *Carroll,* there was some attempt to recite the pertinent facts from the perspective of the certifying expert. By contrast, the Certificate of Merit and Report of Dr. LeDez give no clue as to how the *specific* health care providers were in deviation from accepted standards of care.

Appellees also maintain that the circuit court did not abuse its discretion in denying appellants' Motion for Reconsideration, because the motion "did not raise any additional points

that had not been raised and argued in the original Motions to Dismiss." This, they argue, constituted a failure to show "good cause." Although the Supplemental Certificate of Merit "identifies the individual health care providers by name," appellees observe that it was "not accompanied by a report setting forth the alleged deviations from accepted standards of care, and it is absolutely silent as to ... how any breaches in the standard of care proximately caused the injury and death of the decedent."

Although appellees acknowledge that C.J. § 3–2A–04(b)(1)(ii) authorizes the court to grant the ninety-day extension provided for in that section, they argue that this is a "very narrow remedy," applicable only "where, following unilateral waiver of arbitration, a plaintiff whose case is now in the Circuit Court seeks to add an additional party defendant." They assert:

> It is *only* under those circumstances, however, that the statute empowers the Circuit Court to grant such an extension. In this regard, this Court's attention is drawn to § 3–2A–05(j), which provides the general "good cause" basis for lengthening time limitations in the Health Care Malpractice Claims Act. It states only:
>
>> Except for time limitations pertaining to the filing of a claim or response, the Director or the panel chairman, for good cause shown, may lengthen or shorten the time limitations prescribed in subsections (b) and (g) of this Section and Section 3–2A–04 of this subtitle.
>
> Note that this general "good cause" grounds for extension is *not* given to the Circuit Court, but only to the "Director or the panel chairman."

Moreover, appellees argue that "the trial [c]ourt had no statutory basis for reconsidering its decision in this matter, or for remanding the case to the HCADRO for further action in this regard." *Carroll*, they argue, "made plain" that

> the filing of a proper certificate of qualified expert is a condition precedent to the Circuit Court's consideration of the action at all. The Court in *Carroll v. Konits* has

clarified that until a proper certificate of qualified expert is filed in the HCADRO, the Circuit Court has no authority to entertain the action at all. There is simply nothing in the statute that gives the Circuit Court the authority to do *anything* but dismiss the action if the condition precedent has not been met. The Circuit Court cannot remand the case to the HCADRO.

Appellants respond that *Carroll* does not conflict with out holding in *Barber I*. They assert:

> What *Carroll* stands for is that the licensed professionals as to whom the Certificate (and Report) applies must be mentioned explicitly and/or identified with specificity in such a way so that the opposing party(ies), the HCADRO and the court know to whom it refers. None of these requirements dictates that proper names be included in the Certificate.

According to appellants, *Carroll* does not change our holding with respect to the circuit court's authority to grant an extension of time. To the contrary, they claim "*Carroll* stands for the proposition that, upon a showing of good faith, *at any time*, the time for filing a Certificate of Qualified Expert can be extended." *See Carroll*, 400 Md. at 185, 929 A.2d 19. In their view, "good cause existed for granting an extension of time in this case."

Further, appellants point out that because appellees did not previously argue that the Report itself was insufficient with respect to the basis for the alleged deviation in the standard of care by the appellees, this argument "has never been considered by the Circuit Court or by this Court." They contend that appellees' complaint that the Certificate does not set forth how they deviated from the standard of care "is really an assertion that the *report* does not satisfy the requirements for a report set forth in *Walzer*." Urging us to reject this "attempt to blur the issues," appellants assert:

> Obviously, the report requirement set forth in *Walzer* was not an issue, since *Walzer* was not decided until 2006, over two (2) years after the case was filed and over a year after the motions to dismiss in this case were being considered by

the Circuit Court. The Circuit Court's dismissal of this case was based entirely upon *D'Angelo.* The Appellees did not challenge the Appellants' report in the Circuit Court. In fact, it was not even an issue in this Court's prior evaluation of this case. Now, Appellees, for the first time, are raising this issue.... Certainly, at the time the *Barber* case was filed, the Court of Appeals had not decided either *Walzer* or *Carroll.* These recent cases make it even clearer that good faith exists for the Appellants to amend their filing.

In addition, appellants claim that in appellees' Memorandum, appellees "do not argue that the Health Care Providers were not adequately identified." Instead, assert appellants, "Appellees focus their memorandum on whether appellants sufficiently specified the alleged breaches of the standard of care in their certificate and report. They again blur the line as to whether this information should be contained in the certificate or the report."

Reiterating that the Certificate satisfies *D'Angelo* and *Carroll,* appellants further contend that, if we find the Certificate "does not contain the information pertaining to specific breaches of the standard of care," then

the appropriate remedy would be a reversal of the Circuit Court's dismissal with a remand to that court with instructions to evaluate the report attached to the Certificate of Qualified Expert.[] Whether the report in this case satisfies *Walzer* is not before this Court at this time. However, such a reversal would afford the Appellants the opportunity to have that issue addressed in the Circuit Court, and not for the first time on an appeal founded on other grounds.

Appellants also observe that, effective June 1, 2007, the Legislature amended the law. C.J. § 5–119 now permits a plaintiff to re-file within sixty days if a case is dismissed for failure to file an adequate report under C.J. § 3–2A–04(b)(3).[9]

---

9. C.J. § 5–119 states:

§ 5–119. **Limitation on refiling claim dismissed without prejudice.**

Moreover, appellants dispute appellees' claim that we relied on Dr. LeDez's affidavits in holding that appellants sufficiently identified the "Health Care Providers." They suggest that this Court found that the Certificate, "on its own," adequately identified the Health Care providers without regard to the affidavits, and the affidavits "merely confirmed this point."

In their reply, appellees reject appellants' argument that the identity of the " 'Health Care Providers' was incorporated by reference into Dr. LeDez's Certificate of Qualified Expert." They posit:

There are several things wrong with this argument. First, the Statement of Claim was never actually served on any of the Defendant Health Care Providers. Instead, the Plaintiffs filed the Certificate of Merit in the Health Claims Arbitration Office, and unilaterally waived arbitration. Neither the Claim Form nor the Statement of Claim were, therefore, served on the Defendants. Instead, the Plaintiffs filed a Complaint and Election for Jury Trial, which listed all of the Health Care providers who had been named in the Statement of Claim, but listed them as "Defendants." Moreover, although the "Certificate of a Qualified Expert" of Dr. LeDez stated that "there were departures and/or violations of the standards of medical care rendered to Carolyn Barber by the Health Care Providers," it did not expressly incorporate by reference the list of those Health

(a) *Scope.—*

(1) This section does not apply to a voluntary dismissal of a civil action or claim by the party who commenced the action or claim.

(2) This section applies only to a civil action or claim that is dismissed once for failure to file a report in accordance with § 3–2A–04(b)(3) of this article.

(b) *Refiling of claim after dismissal.—*If a civil action or claim is commenced by a party within the applicable period of limitations and is dismissed without prejudice, the party may commence a new civil action or claim for the same cause against the same party or parties on or before the later of:

(1) The expiration of the applicable period of limitations;

(2) 60 days from the date of the dismissal; or

(3) August 1, 2007, if the action or claim was dismissed on or after November 17, 2006, but before June 1, 2007.

Care Providers in the Claim Form or the Statement of Claim.

Appellees reiterate that the Certificate lacked the specificity required by *Carroll.* Moreover, because a proper Certificate "is a condition precedent to maintenance of the suit," they argue that the defects as to the content of the Certificate and the Report are "not a matter subject to waiver." Relying on *Carroll,* 400 Md. at 182 n. 12, 929 A.2d 19, they claim: "Appellants cannot raise and [sic] argument here that the adequacy of the Certificate and Report is not before this Court because it was not discussed at trial below."

Notably, appellees do not lodge any challenge to our conclusions in *Barber I* as to the import of the use of the words "Health Care Providers" as a defined term; the significance of "et al." in the context of this case; or the applicability of C.J. § 3–2A–02(d) and Maryland Rule 1–301(a).

### III.

█ The Court of Appeals directed us to reconsider our opinion in *Barber I* in light of *Carroll,* and we have done so. We reaffirm our original conclusion that the circuit court erred in dismissing appellants' suit, for the reasons set forth in *Barber I.*

*Carroll* is distinguishable from this case. The certificate at issue in *Carroll* did not satisfy the minimum statutory requirement of stating which health care providers violated the standard of care. There, Dr. Simmons–Clemmons's certificate included the names of five physicians, only two of whom were named as defendants in the suit. But, the certificate obscured the identities of the particular physicians who allegedly violated the standard of care and who were responsible for Carroll's injuries.[10]

---

10. In *Carroll,* the appellees moved to dismiss, both at arbitration and in the circuit court. According to the Court, the appellees claimed that the certificate failed to meet "the specific requirements of § 3–21–04(b)," *Carroll,* 400 Md. at 175, 929 A.2d 19, and they asserted a

In contrast, the Certificate here stated that *all* the Health Care Providers, whose identities were previously supplied by the Claim Form and Statement of Claim, breached the standard of care, thereby causing injury to the decedent. Moreover, as we discussed in *Barber I*, in the context of this case the term "Health Care Providers" was used as a defined term; it specifically and collectively referred to a discrete group— the defendants—all of whom were fully identified and named in the prior submissions of the plaintiffs to the HCAO. *Barber I*, 174 Md.App. at 351, 921 A.2d 811. In addition, as we said in *Barber I*, 174 Md.App. at 351–52, 921 A.2d 811:

> It is also salient that the caption of the Certificate used the abbreviation "et al." after the name of the one defendant listed in the caption. In legal circles, "et al." is a well known abbreviation for the Latin words "et alii" or "et alia," meaning "and other persons." Black's Law Dictionary 373 (8th ed. 2004). The use of that term clearly signaled that the Certificate was not limited to the one entity named in the caption, and referred back to the others previously named in the Statement of Claim.

The *Barber I* Court also said, *id.* at 352, 921 A.2d 811:

> C.J. § 3–2A–02(d) is also relevant. It provides that, unless otherwise indicated, "the Maryland Rules *shall* apply to all practice and procedure issues arising under this subtitle." Maryland Rule 1–301(a) governs the "form of court papers" and provides: "An original pleading shall contain the names and addresses ... of all parties to the action.... *In other pleadings and papers, it is sufficient to state the name of the first party on each side with an appropriate indication of other parties.*"

---

"multitude of reasons" to support their motion. *Id.* at 187, 929 A.2d 19. But, the Court did not make clear whether these reasons, listed at 400 Md. at 187–88, 929 A.2d 19, were *all* raised in the proceedings below, or whether any were raised for the first time on appeal. If the appellees in *Carroll* complained to the trial court about the content of the certificate, *Carroll* would also be distinguishable from the case *sub judice* on that basis.

In *Barber I,* we noted that, in a court action, the plaintiffs need not restate the names of all defendants in every submission to the court, so long as all were named in the initial filing. On that basis, we said: "It is hard to conceive of a valid reason why, in principle, we should impose a more stringent standard for the form of a certificate than for pleadings filed in court." *Id.* at 352, 921 A.2d 811. We continued, *id.*:

> Without question, that is precisely the methodology used by appellants. Each defendant was identified in both the Claim Form and the Statement of Claim, which were the initial filings in the HCAO. Moreover, for convenience, they were then collectively identified in both documents as "Health Care Providers." The Certificate, filed a few months later with the HCAO, in the very same case, used the defined term of Health Care Providers and the common legal shorthand of "et al." to refer to all the defendants previously identified.

As we see it, the facts and circumstances set forth above distinguish the case *sub judice* from *Carroll.* To be sure, the Certificate, when read in isolation, did not explicitly identify the parties who allegedly violated the standard of care. But, by using the defined terms "Health Care Providers," coupled with the use of "et al.," the Certificate clearly referred to the Statement of Claim filed with the HCAO, on which appellants listed all the parties allegedly responsible for the death of Ms. Barber. When read with the Statement of Claim, the Certificate unequivocally identified all of the appellees.[11]

The certificate in *Carroll,* by contrast, did not specify the parties that allegedly breached the standard of care by referring to another document containing the necessary information. The certificate included the names of five physicians, only two of whom were named as defendants in the suit. No additional document existed to clarify which of these five physicians, allegedly, had been negligent. Consequently, the certificate was "useless" because it did not permit the oppos-

---

11. In their memoranda, appellees did not address our conclusions in *Barber I.*

ing parties, HCADRO, and the courts "to evaluate whether a physician, or a particular physician out of several, breached the standard of care." *Carroll,* 400 Md. at 196, 929 A.2d 19. The Certificate in the case sub judice did not suffer from this shortcoming.

What we said in *Barber I,* 174 Md.App. at 353, 921 A.2d 811, remains pertinent:

> In reaching our conclusion, we are mindful that the purpose of the Certificate is to eliminate frivolous claims for substantive reasons. But, it was never meant to extinguish potentially substantive claims for frivolous reasons. We cannot uphold the draconian sanction of a dismissal, tantamount here to a dismissal with prejudice, when the spirit, if not the letter, of the statute was satisfied by the use of the abbreviation "et al.", and the defined term of "Health Care Providers," which everyone involved in the matter understood as a reference to the parties previously identified in the Statement of Claim.

As noted, the Court in *Carroll* articulated various requirements as to the contents of the Certificate. Appellees now argue, for the first time, that the content of the Certificate in this case was impermissibly vague. They maintain that it lacked specificity as to the alleged breaches of the standard of care and is thus defective. Therefore, they claim that appellants failed to satisfy a condition precedent, and thus the suit cannot proceed.

Appellees rely on *Carroll,* which stated, 400 Md. at 181, 929 A.2d 19:

> [T]he filing of a proper Certificate operates as a condition precedent to filing a claim in Circuit Court because arbitration is a condition precedent to filing a claim in a Circuit Court and because the filing of a Certificate is an indispensable step in the arbitration process, i.e., it must occur or the condition precedent is not satisfied. Therefore, if a proper Certificate has not been filed, the condition precedent to maintain the action has not been met and dismissal is

required by the Statute once the allotted time period has elapsed.

The *Carroll* Court continued:

" '[A] condition precedent cannot be waived under the common law and a failure to satisfy it can be raised at any time because the action itself is fatally flawed if the condition is not satisfied. This requirement of strict or substantial compliance with a condition precedent is of course subject to abrogation by the General Assembly.' "

*Id.* at 182 n. 12, 929 A.2d 19 (quoting *Georgia–Pacific Corp. v. Benjamin,* 394 Md. 59, 84, 904 A.2d 511 (2006) (quoting in turn, *Rios v. Montgomery County,* 386 Md. 104, 127–28, 872 A.2d 1 (2005))).

■ This is not a case in which a certificate or expert report was never filed. When this case was before the trial court, appellees could have, but did not, argue that the Certificate or report was insufficiently detailed with respect to how appellees allegedly violated the standard of care. Instead, they argued that the Certificate was invalid because it "did not identify any individual health care providers as having deviated from accepted standards of care[.]" *Barber I,* 174 Md.App. at 339, 921 A.2d 811. For example, when the court below asked counsel for Cardiac Surgery Associates and Dr. Finney if they were arguing that the Certificate failed to "specif[y] *how* the individual physicians and/or hospital breached the applicable standard of care[,]" counsel replied: "[Appellants] don't have to say all health care providers deviated by A, B, C, D[.]" *Id.* at 323–24, 921 A.2d 811.

Moreover, in their original brief to this Court in *Barber I,* appellees maintained, *id.*:

Dr. LeDez's Certificate states, in effect, that there were some departures from standards of care by the health care providers which caused Carolyn Barber injury, but he does not attest that all of the health care providers deviated from accepted standards of care, nor does he attest which, if any, of the deviations from accepted standards of care by these

unidentified health care providers actually caused injuries to the Plaintiffs' decedent.

It was only *after* the first appeal in *Barber I*, and *after* Carroll was decided, that appellees argued, on remand to this Court, that the Certificate should have gone into greater detail. Appellees insist that their arguments about the Certificate are not subject to waiver, because the filing of a valid Certificate is a condition precedent to suit, and can be raised on remand.

Although these principles may enable appellees to raise their concerns before the trial court, we do not construe *Carroll* to compel this Court to consider the issue at this juncture, and we decline to do so.

■ Our review of the trial court's decision is constrained by Rule 8–131(a), which provides, in part: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court. . . ." We recognize that we have discretion under Maryland Rule 8–131(a) "to address an issue that was not raised in or decided by the trial court." But, this discretionary power is one

that appellate courts should rarely exercise, as considerations of both fairness and judicial efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

*Chaney v. State*, 397 Md. 460, 468, 918 A.2d 506 (2007),

■ The Court of Appeals has said that "the main purpose of Md. Rule 8–131(a) is to make sure that all parties in a case are accorded fair treatment, and also to encourage the orderly administration of the law." *Conyers v. State*, 354 Md. 132, 148–49, 729 A.2d 910 (1999); *see State v. Bell*, 334 Md. 178,

189, 638 A.2d 107 (1994); *Blasi v. State,* 167 Md.App. 483, 512, 893 A.2d 1152 (2006). The rule advances fairness by " 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.' " *Bell,* 334 Md. at 189, 638 A.2d 107 (citations omitted).

Moreover, the issue as to the adequacy of the Certificate is not jurisdictional. We explain.

As the Court of Appeals has said, "jurisdiction" concerns " 'the *power* [of the court] to render a judgment over that class of cases within which a particular one falls.' " *Downes v. Downes,* 388 Md. 561, 575, 880 A.2d 343 (2005) (quoting *Carey v. Chessie Computer,* 369 Md. 741, 756, 802 A.2d 1060 (2002) (additional citations omitted)). The *Downes* Court thus concluded that a statutory time limitation, while mandatory, was not a "jurisdictional impediment." 388 Md. at 575, 880 A.2d 343.

We also find support for our position in *Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860 (1982). There, Willard and Layla Oxtoby filed a complaint against Larry McGowan, M.D., on November 20, 1979, alleging that Dr. McGowan was negligent in performing surgery on Ms. Oxtoby in 1974. *Id.* The Act went into effect on July 1, 1976. Ms. Oxtoby was diagnosed with cancer in 1977 and died on June 17, 1980, during the pendency of the case. *Id.* at 87, 447 A.2d 860. Mr. Oxtoby subsequently amended the complaint on August 6, 1980, adding a survival claim as personal representative of his wife's estate, and adding wrongful death claims for himself and the decedent's two children. *Id.*

Trial commenced in January 1981. At the close of evidence, Dr. McGowan filed a motion to dismiss, claiming "the trial court was without initial jurisdiction" to entertain the claims against him because they "were covered by the Act and were thereby required to be submitted to the Act's arbitration procedure," which the plaintiffs had failed to do. *Id.* at 87, 447 A.2d 860. The court denied Dr. McGowan's motion, without supplying any reasons. *Id.* at 88, 447 A.2d 860.

After the jury found in favor of Dr. McGowan, the plaintiffs moved for a new trial, alleging "that the court was without jurisdiction to entertain the action." *Id.* They conceded that "the case as originally brought was within the jurisdiction of the trial court[,]" but explained: "[T]he wrongful death and survival statute claims could not have existed until [Ms. Oxtoby's] death, which occurred well after the Act had been adopted." *Id.* at 89, 447 A.2d 860. The trial court denied the post-trial motion.

On appeal, the plaintiffs argued that the decedent's medical injury occurred after the effective date of the Act. *Id.* at 90, 447 A.2d 860. Therefore, they maintained "that they may assert this position for the first time on appeal because it challenges the jurisdiction of the trial court over the subject matter and therefore may be raised at any time." *Id.* at 91, 447 A.2d 860.

Of import here, the Court stated: *id.* (emphasis added):

In our recital of the procedural background we have used the word "jurisdiction" because that was the term employed by the parties. *The Act, however, does not take away the subject matter jurisdiction of a circuit court to hear and render judgments in cases involving claims which fall within the Act.*

The Court observed that the arbitration clause in the Act "creates 'a condition precedent to the institution of a court action . . . ,' " *id.* (citation omitted), and was "analogous to the doctrine of exhaustion of administrative remedies." *Id.* at 91, 447 A.2d 860 (citation omitted). It concluded, *id.* at 92, 447 A.2d 860:

Thus, the plaintiffs in this case may for the first time on this appeal adopt the position that the injury to [the decedent] was a medical injury occurring after July 1, 1976. Compliance with the Act's precondition to court suit may not be avoided by express agreement of the parties or by mere oversight, at least prior to final judgment and final determination of all direct appeals.

*Simpson v. Moore,* 323 Md. 215, 592 A.2d 1090 (1991), is instructive by way of analogy. There, the Court held that a plaintiff's claim against the State was barred by her failure to comply with a condition precedent-the 180–day filing requirement of the Maryland Tort Claims Act. Of import here, the Court commented that the condition precedent was not jurisdictional, stating, *id.* at 229, n. 4, 592 A.2d 1090:

In agreeing with the State that the plaintiff's claim is barred for failure to satisfy a condition precedent, we do not accept the State's characterization of this as a "jurisdictional" defect, at least not in the sense of fundamental jurisdiction. The court had jurisdiction of the parties and subject matter.

Accordingly, appellees' belated contention that the content of the Certificate was inadequate is not a jurisdictional issue that we must review, despite appellees' failure to raise it below. In our view, it is not appropriate for this Court, in the first instance, to assess the sufficiency of the Certificate; that is a task better left to the able trial court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.**